## George F. Davidson *v.* Willie A. P. Jones et al.

A consideration different from that which is expressed upon the face of a deed or note, cannot be set up or proved.

M. sold a tract of land to J., for which he executed to J. a bond for title, he (M.) retaining in himself the title of the land, to secure other liabilities he had already, and others he might incur for J., who, at the time of the sale, executed his promissory notes to M. for the purchase-money of the land; and several years afterwards, the notes remaining unpaid, J., to get further time to make payment, executed for M.'s use a deed in trust on certain slaves and other personal property, to secure the ultimate payment of the purchase-money due on the land. In the mean time, J. delivered to M. the bond for title to the land, which was accepted; and M. proceeded to have sold, the personal property conveyed in the deed of trust, which was purchased by M., and the proceeds applied to the satisfaction of the liabilities he had incurred for J.; but soon after the execution of the deed in trust, and before the sale under it, D. obtained a judgment against J., which is unsatisfied. *Held*, that the proceeds of the sale under the deed in trust, were properly applied.

In error from the northern district chancery court at Holly Springs; Hon. Henry Dickinson, vice-chancellor.

G. Davidson filed his bill in the court below against Jones and Matthews, alleging, in substance, that on the 2d of June, 1846,

Davidson v. Jones et al.

he recovered a judgment against the defendant Jones in the district court of the United States, at Pontotoc, for $1,195.99 and costs, and that execution has issued on that judgment, and been returned *nulla bona* by the marshal; that the said judgment is still wholly unpaid, and that Jones has property, real and personal, sufficient for the payment of all his debts; but that, in order to prevent the payment of his debts, and to secure to himself the use and enjoyment of his property, he has combined with the defendant Matthews, his brother-in-law. He has so incumbered the title to his property, which he has continued to hold in his possession, as to place it beyond the reach of the officers of the law.

That Jones has occupied and cultivated the south half of section eleven, township three, range one west, in Marshall county, and has had in his possession several slaves, together with horses, cattle, farming utensils, furniture, &c.; and that he raised a crop in 1849, and disposed of it for his own benefit.

That Jones, on the 27th of December, 1845, conveyed to M. D. Robinson in trust, seven slaves, named in the deed, together with cattle, to secure an alleged debt of $2,032.50 to the defendant Matthews.

That the said alleged debt of $2,032.50, if it existed at all, was due on account of land sold by Matthews to Jones, which land was bound for the payment of the debt, because Matthews retained the legal title as a security for the payment of the purchase-money, so that there was no occasion for the execution of said deed of trust, which fraudulently embraced property worth two or three times the amount of the debt to be secured.

That Jones and Matthews some time since fraudulently procured a pretended sale of the trust property to be made by Robinson, the trustee, and Matthews became the purchaser of the property, and has since continued to claim it as his own, but not *bonâ fide*, as Jones has ever since used and enjoyed the property as he had previously done.

That the complainant caused an execution to be issued upon his judgment, with the view of having it levied upon the slaves that were purchased by Matthews under the deed of trust, and

that Matthews, having been informed of the design, removed the negroes during the night out of the State of Mississippi, in order to prevent the intended levy, and under the immediate apprehension thereof. The bill prays for a discovery, and for a decree against Matthews for the payment of the complainant's judgment, and for general relief.

Jones and Matthews answered jointly, and admit the recovery of the judgment against Jones, as charged, and that an execution had been issued and returned *nulla bona.*

Matthews states that, in 1839, he sold to Jones three hundred and forty acres of section eleven, township three, range one west, in Marshall county, at six dollars per acre·; and Jones executed his notes for the purchase-money, as specified in the deed of trust filed with the bill, and received the title bond of Matthews, conditioned to make him a title to the land upon the payment of the purchase-money; and that Jones, without paying any part of the purchase-money, held possession of the land, and cultivated about one hundred and fifty acres of it, from 1839 to 1847.

That Jones, about 1843, engaged in merchandising with one E. A. Warren, and soon became involved in heavy liabilities; and in 1845, Warren closed the business with a loss, and an indebtedness to the firm of near $7,000, and then left the State insolvent. Up to this time, Jones had paid Matthews nothing upon his land contract.

That Matthews was a brother-in-law of Jones, and desirous to assist him, and, if possible, to extricate him from his embarrassments; but, at the same time, he wished to secure himself for the payment of the purchase-money due upon the land, as well as for other indebtedness and liabilities of Jones to him.

Matthews states that, at the date of the deed of trust, Jones owed him about $800 for loaned money, and near $3,500 on which Matthews had become his surety or indorser; and Matthews, therefore, resolved to take the deed of trust to secure Jones's land debt, which then amounted, with interest, to about $3,000, and to hold on to the title to the land to secure himself for money then paid and the liabilities then incurred by him for Jones, as well as for future advances and liabilities for

him; all of which was agreed to between them at the time, and Matthews thereupon became liable for Jones in the further amount of near $1,500, and also paid and advanced for him some $500 or $600.

Both respondents aver that, for some time prior to the date of the deed of trust, the liabilities of Jones to Matthews far exceeded in amount the value of said land, and of the property embraced in the deed of trust, and have ever since, and do now, exceed the same.

Matthews avers that it was upon the consideration of the deed of trust, and the agreement that he should retain the title to the land, that he made the advances and became liable for Jones. He also avers that Jones abandoned the purchase of the land, and surrendered the title bond of Matthews, before the rendition of complainant's judgment.

They state that the trust property was sold pursuant to the provisions of the deed of trust, and purchased by Matthews at about the price of $3,300; all of which, except about $200, the surplus, was applied to the extinguishment of Jones's indebtedness for the land, according to the terms of the agreement between Jones and Matthews.

Both respondents deny that the trust sale was fraudulent, and aver that it was fair and *bonâ fide*. They also deny the charge that, after the sale, Jones continued to hold and enjoy the property, as he had previously done, and state, in explanation, that, at the time of the trust sale, Jones had a crop growing, which needed gathering, and inasmuch as Matthews was not pressed in his own crop, he permitted the slaves to remain with Jones until the end of the year, and also allowed his other negroes to assist, the slaves being in the mean time under the control of Matthews.

That in 1848, Jones having no slaves except a boy, Jacob, his mother gave him the use of five hands of her own, and with these hands Matthews employed him on his plantation as an overseer, allowing him a *pro rata* division of the proceeds of the crop, according to the number of his hands. This arrangement continued until July, 1849, when Jones's health obliged him to quit overseeing, during all which time the negroes in

question were managed and controlled by Jones as the property of Matthews; and ever afterwards the slaves continued in the possession of Matthews.

They charge that, at the date of the trust sale, the purchase-money for the land, and the sums paid and assumed by Matthews for Jones, amounted to a sum far greater than the value of the land and trust property together; and the indebtedness of Jones to Matthews afterwards became larger and more disproportionate to the amount of property which he had to indemnify Matthews, who claims that he had the right, in equity and fairness, to reserve the title to the land until his claims against Jones were discharged.

Matthews states it was his wish to aid Jones, and that he has done so to his own loss, in the hope of saving him from ruin; but, finding that the condition of Jones was becoming more and more desperate, his duty to himself required him to adopt the course which he pursued, in order to avert great loss and damage.

Jones states that Matthews was, at the date of the deed of trust, and now is, the security, or in some way bound for every debt of any considerable amount that he owed, except the judgment of the complainant, and had offered to pay that in lands.

Matthews states that Jones was a young man, his brother-in-law, to whom he was strongly attached, and for whose benefit he freely used his means and credit; and he claims protection from the court for the only indemnity he has been able to get.

Both respondents deny the charges of combination and confederacy, to hinder, delay, and obstruct the creditors of Jones, made against them in the bill; and they state, in explanation of any apparent control exercised by Jones over the property of Matthews, that for some three years Jones acted as agent for Matthews, managing his business.

Matthews denies that he run off the negroes in the night in order to defeat the complainant's claim.   He states that when the marshal demanded the negroes, he told him he should not have them until he (Matthews) could get legal advice; that he had bought them fairly under the deed of trust, and did not

intend to give them up.   He denies that the negroes have ever been removed out of his possession, out of Marshall county, or out of the State of Mississippi.

Both respondents state that the debt on which the complainant's judgment was founded, was contracted in the purchase by Jones of a negro boy named Jacob; and that that boy Jacob remained in the possession of Jones, liable to execution, from the date of the judgment until 1848; and that, the trust sale having discharged the trust deed, nearly all the personal property covered by the deed, except the slaves, has remained subject to an execution, from the date of the sale up to January, 1850; which negro Jacob, and the other property, and Jones's whole crop of 1846, and his interest in the crops of 1847, 1848, and 1849, were, during the whole time, open to complainant's execution, and might, but for his gross laches and neglect, have been subjected by him; and Matthews insists that, even on this ground, the complainant cannot now be permitted to interfere with his just rights and claims.

Complainant's bill was dismissed, and he prayed this writ of error.

*Watson* and *Craft*, for appellant.

Complainant's judgment was rendered in June, 1846, and the alleged sale under the deed of trust, did not take place until September, 1847, more than twelve months after the debt, to secure which the deed was executed, had been cancelled; and this cancellation of the said debt, by the rescission and mutual abandonment of the contract out of which it had grown, having occurred before the maturity of the trust, or a breach of its condition, the said trust, in law, as well as in pursuance of the express stipulation of the parties, was null and void, when the said alleged sale of the negroes was made.   1 Lomax, 326; 4 Rand. 248; 3 Denio, 35.

Looking to the answer alone, it is certainly entitled to no weight as evidence; but were this fact otherwise, its credibility would be wholly destroyed by the many instances in which its statements are contradicted by the testimony.

The charge made in the bill, of the removal of the property

by Matthews, to prevent a levy upon it, is indignantly denied; and yet the deputy marshal, whose testimony is full, explicit, and satisfactory, proves that when he called to make the levy, he was informed by Matthews that he had been anticipated; — that the slaves had been placed beyond his reach, — sent to Tennessee.

Nor is the case of defendants at all aided by the deposition of Jones. The discrepancies between the deposition and the answer have already been pointed out, and seem to be wholly irreconcilable. The effect of the answer, then, must be to destroy the credibility of the deposition; and of the deposition, to destroy the credibility of the answer.

The weight of an answer, and that of the testimony of a witness, are to be tested by the same general rules; and where a court is left in a reasonable and real doubt as to the credibility of either, it should be wholly disregarded. 10 Yerger, 92; 2 Iredell, 250. Where the different statements of a witness in chancery are inconsistent with each other, his whole testimony will be disregarded. 16 Ohio, 338.

In view of the whole case, the complainant is certainly entitled to relief, either as against the negroes, or against the land.

If the trust and sale under it were fraudulent, or if the debt mentioned in the trust had been cancelled, before the sale of the slaves, Matthews has acquired no title to the slaves, and they are now legally subject to complainant's judgment. But, conceding the validity of the trust, and the sale of the negroes, the land was paid for by Jones, and became and was his property. And if, as defendants contend, Jones subsequently sold the land to Matthews, such sale was by parol only, and therefore void, because in contravention of the statute of frauds; and the land remains subject to complainant's judgment. Hutch. Code, 637; 4 Blackf. 425, 426; 2 Grattan, 280; 9 S. & M. 207; 13 Ib. 93.

*Stearns* and *Glenn*, for appellees.

Every allegation of the bill is positively and circumstantially denied in the answers, and unsupported by one single item of proof. Upon this state of facts, the bill at the very threshold

was properly dismissed. Story, Eq. Pl. § 849 a, and many cases cited.

The cases cited by opposing counsel in 2 Ired. and 10 Ohio, have, in our opinion, not the least application to this case.

It is a clear rule of equity that fraud cannot be presumed, but must be proven; and circumstances of mere suspicion leading to no conclusion with certainty, will not be deemed sufficient ground to establish fraud. Story's Eq. § 19 and cases cited.

Jones had right to secure Matthews prior to other creditors. He could prefer one or more creditors, as he pleased, provided it be done *bonâ fide*, and there is no proof to the contrary here. Story's Eq. § 370 and cases cited; 2 Aikin, 150.

The witnesses examined by complainant (Kirk and Wilder), clearly and undoubtedly sustain every allegation contained in respondents' answer. The law, as well as the whole facts of the case, we confidently believe entitle the appellees to an affirmance of the judgment of the court below.

Mr. Justice HANDY delivered the following dissenting opinion.

The facts of this case necessary to be noticed in determining the questions of law affecting it, are briefly as follows: —

In 1839, Matthews bargained to Jones a tract of land for the sum of $2,032.50, for which Jones gave his three notes, payable in three annual instalments, and took from Matthews a bond to convey the title upon the payment of the purchase-money. In December, 1845, the notes being unpaid, Jones executed a deed in trust, in order to obtain further time for their payment, and " to secure the payment of said debt at the expiration of eighteen months," and this is the sole purpose of it appearing on its face. The deed conveyed certain slaves and other personal property. Afterwards, but at what time it does not distinctly appear either by the answer or the proofs, " Jones abandoned the purchase of the land, and delivered up the title bond " to Matthews. It is not shown what became of the notes given for the purchase-money of the land, or that they were outstanding; and it must be presumed that they were cancelled, as the contract for the land, for which they were given, was rescinded. The answer avers, that Matthews made advances of money,

and became liable for Jones, on an agreement that he should retain the title to the land agreed to be sold to Jones, and that Jones accordingly abandoned the contract for the land, as above stated.   Jones states, that when he agreed to secure Matthews on the land notes, (that is to say, to execute the deed in trust,) he " agreed that Matthews should reserve title to the land, in order to secure himself on Jones's account."   But there is no evidence, either in the pleadings or proofs, that when the deed in trust was executed, any thing more was intended than to secure the payment of the three notes given for the purchase of the land.

At the time the trust deed was executed, the creditor Davidson had an action pending against Jones, on which he shortly thereafter obtained judgment; and, finding no property out of which to make the money, he filed this bill in equity to set aside a sale, made under the trust deed, of the slaves therein conveyed, to Matthews, after the rendition of the judgment, praying discovery and general relief.   No contest is made in relation to the land, for that revested in Matthews upon the rescission of the contract of sale.

The validity of the sale to Matthews depends upon the simple question, whether the deed in trust was in force at the time of the sale?   If the debt secured by the deed was discharged, unquestionably the deed itself ceased to have any legal existence, for the debt is the principal, and the trust deed the mere incident, and the incident follows its principal and falls with it; and this is especially true as against a purchaser with notice, as Matthews was.   What, then, was the debt secured by the trust deed?   It speaks for itself, and says it was the three notes given in 1839, which the pleadings and proof show were given for the purchase-money of the land.   Now, when the contract for the purchase of the land was rescinded, as it clearly was, what consideration was there for the notes? Certainly none whatever; the consideration for which they were given having been wholly cancelled.   Suppose, then, that Matthews and Jones agreed, upon the cancelling of the contract for the land, that the notes should continue outstanding, (of which there is no proof,) and that new vitality should be

Davidson *v.* Jones et al.

given them, by an agreement that they should remain as a security for other indebtedness of Jones to Matthews. This would amount in law to no more than the execution of new notes. Their original character and effect were lost by the discharge of the consideration, and they took their legal effect from the time of the new agreement and reissue. The notes secured by the deed in trust were, to all legal intents, extinguished, and the reissued notes must take their character and legal effect from the new consideration upon which they were founded; but they thereby become in law as distinct from the notes secured by the deed, as if they had been written on new paper and of different dates and amounts, and of course were deprived of all security of the trust deed.

This conclusion seems to me unavoidable, unless it can be shown, that when the consideration of a note is annulled, it does not of itself become totally extinguished as between the parties to it. If these views be correct, the deed in trust ceased to be operative when the notes, which it was alone intended to secure, were discharged. If this were not true, it would hold out the strongest inducements to dishonesty, by permitting fraudulent debtors to keep alive satisfied mortgages, judgments, or other incumbrances upon their property, *ad infinitum*, in the hands of friendly creditors. The community could never act safely under the assurance that the particular debt specified in the mortgage or deed was discharged; for though that were the case, it would turn out, whenever it suited the convenience of the parties, that the mortgage or trust-deed had been extended to some other transaction, and to secure some other debts, and this might be amplified without limit, so that there would be no safety to the rights of creditors and purchasers, and the country would be filled with secret incumbrances. It is for the protection of subsequent purchasers and creditors that it has been settled, that it is incompetent to the parties to show any other consideration than that specified in a deed. But the position taken in support of this sale seems in direct opposition to that rule. It is nothing, in substance, but an effort to show a consideration different from that stated in the deed.

If, therefore, the original notes were still outstanding when

6 *

the sale was made, they could not support the trust deed and the sale under it. Much less could the sale be supported, if the notes were actually cancelled; and there is no proof whatever in the record to show that they were not cancelled; and the presumption of law, from the rescission of the contract, is, that they were cancelled and delivered up.

Under this view of the case, I am of opinion that the decree dismissing the bill is erroneous, and should be reversed.

Mr. Chief Justice SMITH delivered the opinion of the court.

The plaintiff in error, George F. Davidson, on the 2d of June, 1846, recovered a judgment in the district court of the United States at Pontotoc, against Jones, one of the defendants in the court below. Upon that judgment several executions were issued, and returned " no property found."

The object of the present suit, which was instituted in the vice-chancery court at Holly Springs, was to subject to the payment of the judgment, certain property conveyed by a deed of trust, executed on the 27th day of December, 1845, by said Jones, for the benefit and protection of the defendant Matthews.

The bill charges fraud in the execution of the trust deed; and sets out that Matthews, by " a pretended and simulated sale," made under color of said deed of trust, became the purchaser of the slaves mentioned therein, and that he has removed them beyond the reach of an execution on the judgment. The fraud charged in the bill is denied in the answer, which avers that the trust deed was executed in good faith, for the purpose of securing the payment of the notes therein described; the consideration of which was the sale of a certain tract of land, before the date of the trust deed, made by defendant Matthews to defendant Jones; the former having executed to the latter a bond for title on the payment of the purchase-money.

It is further averred in the answer, that, prior to the execution of the deed of trust, Matthews was liable, as surety for Jones, in the amount of about $3,500. Also that Jones, independent of that liability, was indebted to Matthews in about the sum of $800, for money loaned. That Jones being the brother-in-law of Matthews, the latter intended to make him further advances,

in order to extricate. him from his pecuniary embarrassments, and that " these being the facts, Matthews resolved to take, and did take, from Jones the deed of trust on the property therein contained, in the first place, to secure the purchase-money for the land, amounting to about \$3,000." Matthews further determined to retain the title to the said land to secure himself for the money then paid, and liabilities there incurred for Jones, and for any further advances he might make to, or liabilities incurred for, him; all of which was agreed to by Jones. It is further averred that advances were afterwards made to Jones by Matthews, and that additional liabilities were incurred.

It is further stated in the answer, that " Jones abandoned his aforesaid purchase (of the land) and delivered up the said title bond to Matthews before the rendition of complainant's judgment. It appears that the sale under the deed of trust, at which Matthews purchased the slaves, was made on the 11th of September, 1847. Hence the title of Matthews to the said slaves arose subsequent to the rendition of the complainant's judgment, which, as we have seen, was of the date of the 2d June, 1846.

If by the transactions which are alleged to have taken place between the respondents, Matthews and Jones, the consideration on which the deed of trust was based, was discharged or destroyed, that deed should be held in equity as having ceased to operate from their date; at least so far as the claims of the creditors of Jones were concerned. ' A material question thence arises as to the effect which should be given to the agreement between Matthews and Jones, the abandonment by the latter of the purchase of the land, and the surrender by him of the bond for title.

In behalf of the plaintiff in error, it is contended, that by Jones's abandonment of the purchase of the land, and the delivery to, and the reception by Matthews of the title bond, the consideration of the notes mentioned in the trust deed was released, and consequently, the purpose for which the deed was executed was put an end to; and that it is now incompetent for the defendants in error to substitute a new consideration for that upon which the transaction was in fact bound.

It is well settled, that a consideration different from that which is expressed upon the face of a deed or note, cannot be set up or proved. But I apprehend that the question is not, whether it was competent for plaintiffs in error to show that the deed of trust was, by agreement between them, to stand as a security for the liabilities incurred by Matthews, and the advances then made or which might thereafter be made by him to Jones, but whether the agreement and the transactions thereupon, had, in fact and in law, put an end to the original consideration of the notes secured by the deed of trust. In order, therefore, to understand properly the nature and legal effect of what was alleged to have been done by the parties, we must look as well to their situation and the purposes which they intended to accomplish, as to the statement of the transaction contained in their answer.

Matthews, at the date of the redelivery to him of the title bond, had become involved with Jones, and was liable, as his surety, in a large sum of money, and had become his creditor by a loan of $800. He was desirous of affording him further assistance, if assistance were necessary. Jones's whole property, with the exception of the land, to which he would have a perfect equitable right on payment of the purchase-money, was embraced in the deed of trust to secure the payment of the same. Matthews held no security whatever against his liabilities, nor for the eight hundred dollars which he had advanced to Jones. In this condition of things, it was certainly desirable on the part of Matthews to obtain indemnity against his liabilities and security for the money advanced. And we apprehend that it was fully competent for him to accept a surrender of his title bond, or a release of Jones's equity in the land, without affecting in the slightest degree the consideration of the notes, or impairing the operative effect of the trust deed. This seems too clear to admit of debate. For if it be supposed that Matthews had conveyed the land in fee, instead of executing a bond conditioned to make title on payment of the purchase-money, it cannot be doubted that Jones might have reconveyed the land to Matthews without affecting the validity of the trust deed, unless the reconveyance were made in pay-

Davidson v. Jones et al.

ment or discharge of the notes given for the purchase-money of the land. And this appears to me to have been the character and effect of the transaction. Matthews, on account of the liability incurred for Jones, and on account of the sum already advanced, and the money to be advanced, determined to hold the title to the land. This was agreed to by Jones, who abandoned the purchase and surrendered the bond for title. It was but a method, perhaps an informal one, by which, in my view of the subject, it was intended to release Jones's equity in the land. But as to the effect of the transaction, whether in contemplation of law it was sufficient for that purpose, no question can arise in the case before us, as it is not sought to subject the land to the payment of the plaintiff's judgment. I think, therefore, that the consideration of the notes was not released; hence, that the sale to Matthews vested in him the title to the slaves, freed from the lien of complainant's judgment, unless the trust deed, for some other reason, was invalid. This brings us to the consideration of the remaining question in the cause.

The averments of the bill, that the deed of trust by which the slaves in question were conveyed by the defendant Jones to the trustee Robinson, was executed for the fraudulent purpose of delaying and defeating the claims of his creditors; and that the sale of said slaves made by the trustee, at which Matthews became the purchaser, was simulated and pretended and made for the like fraudulent purposes, are positively and specifically denied in the answer. The allegations of fraud are but feebly, if supported at all, by the evidence adduced by the complainant. On the other hand, the evidence of the defendants clearly and fully sustains the answer. It explains satisfactorily the facts alleged in the bill, from which, if unexplained, a presumption of fraud on the part of the defendant Matthews might have arisen. The decree of the vice-chancellor, dismissing the bill, is therefore affirmed.

FISHER, J., having been counsel, gave no opinion.

NOTE BY REPORTER. The judges who sat in this case being equally divided, the decision of the court below is of course affirmed.