## Ralph Butterfield v. David Stanton et al.

1. Statute—Construction—Trusts—Liens.—The statute, Rev. Code, 336, art. 24, is in its effect, exceptional and almost penal, and ought, therefore, to be strictly construed.   Though it declares the trust therein specified void as to a certain class of creditors, it creates no lien in their favor on the property which is thus subjected to their debts, and is bound only as other property, there being no lien until one is obtained by judgment or otherwise.

2. Statutory lien—Debtor and creditor—Practice.—To benefit creditors, the contract of credit ought to be based upon the property, and it should be made definitely to appear at the time, that the *possession* of the particular property was the inducement to the giving of the credit; the creditor seeking the advantage of the statute must bring himself affirmatively within its provisions.

3. Married women's law—Separate property.—The married woman's law of 1839, Huch. Code, 497, § 1, did not change the rule in equity relative to the property of the wife, but left it as it stood before, it being evidently the intention of the legislature to effect no change whatever in the law relative to gifts, etc., from the husband to the wife. 24 Miss., 181.

4. Specific performance—Statute of frauds.—Where, to a bill for specific performance, the statute of frauds could have been successfully interposed, yet, if the conveyance has been made, and for a valuable consideration and from honest motives, it ought to be sustained.

5. Separate estate of wife—Applied to husband's debts exonerated.—Where a wife charges her estate with the payment of her husband's debts, or applies her separate estate to such purposes, and it does not appear to have been intended by her as a gift to her husband, equity will decree the husband's assets to be applied in exoneration of her estate, or in re-payment of the money advanced. Cord, § 980, p. 525; 36 Miss., 510.

6. Husband may transfer to wife—Good as to creditors.—That the husband and wife after marriage, may contract for a *bona fide* and valuable consideration, for a transfer of property from the husband to the wife, or to a trustee for the benefit of the wife, is well settled by the decisions of this court. Such conveyances when so made are good against creditors and purchasers. 36 Miss., 510; 43 Miss., 31.

7. Agreement between Husband and Wife Fraudulent.—Agreements between husband and wife during coverture, for the transfer of property from the former directly to the latter, are undoubtedly void at law, and courts of equity will act with great caution before confirming them.

8. Husband's transfers to wife—When sustained.—In cases where it clearly appears that the consideration of the transfer was a separate interest of the wife, yielded up by her for the benefit of the husband or that of their family, or which has been appropriated by him to these uses, or where it appears that the husband was in a situation to make a gift of property to the wife, and distinctly separates it from the mass of his property, for her use, such transfers will be sustained in equity although no trustee be interposed. 10 Peters, 583.

9. Conveyances to the wife—Intention of parties supported.—Where property is inherited by the wife, or is conveyed to her by a third person (not the husband, out of his own property), the rule is well established in equity, that the interposition of a trustee is not indispensable; and whatever estate is given, devised to, or settled upon a married woman, either before or after marriage, for her separate use, without the interposition of trustees, the intention of the parties shall be effectual in equity, and the wife's interest protected against the marital rights of the husband, and also of his creditors. Story's Eq. Jur., § 1380.

Error to the chancery court of Adams county.    Smiley, J.

*W. T. Martin,* for plaintiff in error,

Insisted that the plaintiff in error was entitled to have his debt satisfied out of the "Elms property;" under the pro-

vision of the Revised Code, 336, art. 24. Plaintiff in error testified that he did examine the record touching the title to the "Elms property," and only gave credit when, and because, he had found that the title was in David Stanton. This is his uncontradicted testimony. And he further swears he would have loaned the money but for the possession of that property by David Stanton. It is not required that the credit should be given *solely* because of the possession of property bought with the wife's money. The object of the statute was to guard innocent dealers against loss when they availed themselves of every proper means of inquiry and investigation. There was gross negligence on the part of Mrs. Winston, Mrs. Stanton, and David Stanton in so leaving the title in himself.

They contended that the property, so long as it remains in the hands of David Stanton, or his wife, or her trustee, is subject to the satisfaction of Butterfield's claim, although it certainly could not be reached in the hands of an innocent purchaser. But Mrs. Winston and Mrs. Stanton, nor either of them, stand in that position. From the day of the giving of credit upon the faith of David Stanton's owning the property, it was subject to the payment of appellant's demand, and neither the wife nor her trustee could hold adversely to a creditor, who, in the language of the statute, " gave credit in consequence of the possession of such property." As against them there was a lien in favor of the plaintiff in error for the satisfaction of his claim.

*Harris & Withers,* for defendants in error,

Contended that the credit in this case was not given on account of the possession of the Elms property, but on account of Mrs. Winston's name and property. It is clear that the note sued on was not predicated on the possession of the Elms. Rev. Code, 336. The statute means more than that credit which is founded in the comprehensive consideration of ample means, good character. There must be some special reference to the particular property ; such reference to

it, that but for its possession the contract would not have been made or the credit given. The facts that the debt matured and that the plaintiff in error instead of demanding the money, renewed it on the faith of Mrs. Winston's solvency and property, are conclusive against him.

This case does not fall within the statute, for severel reasons: First, There was not that kind of giving credit on the faith of particular property, which is meant by the statute. Second, The trust, if it ever existed, ceased before the creditor was in a condition to charge the property. Third, There was not in this case any such resulting trust as contemplated by the statute. We must discriminate between the debts as to which the wife's claim is not, and those as to which her claim is available, and there must be something to distinguish the claim against the specific property from the creditor's claim against the general property of the debtor.

It is clear we cannot take the fact that credit was given after the acquisition of the property by the debtor. In the contract there must have been some special reference, by the parties, to this particular property, other than the general confidence inspired by the whole of the debtor's available resources, otherwise, the *application of the statute is impossible.* But it must distinctly appear that the possession of the property occasioned the credit. Where one buys property with the money of another and takes the title in his own name, there is an implied trust. In such case, as between the *cestuy que trust* and creditors of the trustee, the trust, if free from fraud in the beneficiary, will prevail. See Kelly v. Mills, 41 Miss., 267.

Again, it is clear, the creditor seeking to avoid the implied trust, must do so before the trust becomes extinguished by a *bona fide* conveyance. A husband who, by the use of his wife's separate property for any purpose, becomes her debtor, and gives rise to an equitable and meritorious claim on her part, is as much bound to pay or satisfy her claim as that of any other person. Willey v. Gray, 36 Miss., 516; Cord on Rights of Married Women, 115, § 222; ib., 19, § 44; ib., 15, § 34.

The husband had purchased the property on his own credit, and not with his wife's money. At the time of the conveyance of the property to him he clearly did not hold it in trust for his wife. For twelve months he held title as absolute owner under the law. He agreed to sell to the trustee of the wife, or to transfer it to the trustee of the wife if she, the trustee, would pay for it. Manifestly, in the view of a court of equity, the husband incurred a debt to his wife on account of her separate estate, which he was bound to pay, and which constituted a valid consideration for the conveyance of any property he held.

The doctrine settled by this court, and the authorities recognize the validity of a conveyance, against all creditors, by husband to the use of the wife, in such a case as this is admitted to be. "Was the conveyance fair and untainted with fraud?" is the language of the court in Willey v. Gray. It is admitted by appellant's counsel that the conveyance was free from any actual fraudulent intent, and this admission, extorted by proof that leaves no doubt of the purity of the witnesses and the existence of a substantial consideration, disposes of the case. See Freeman's Ch. R., 311; Cord on Rights of Married Women, 525, § 980.

TARBELL, J.:

At the April term, 1867, of the chancery court of Adams county, Ralph Butterfield filed his bill of complaint against David Stanton, Anna E. Stanton, and Ann W. Winston, to set aside a conveyance, for fraud, made by the defendant, David Stanton, to defendant, Ann W. Winston, in trust for Anna E. Stanton, and to subject the property to the satisfaction of a judgment at law, recovered by the complainant against the defendants, David Stanton and Ann W. Winston.

The record discloses the following facts:

David Stanton, and Anna E. Winston, daughter of Geo. Winston, and Mrs. Ann W. Winston, intermarried in 1834. Mrs. Stanton having inherited a large fortune from her father, it was settled upon her by agreement with, and con-

veyance from, her husband to Mrs. Ann W. Winston, as trustee, in 1843, at which time Stanton owed no debts which he did not subsequently pay. During this period Stanton and Stockman were merchants and partners in Natchez, doing a large, prosperous and increasing business, with an unbounded credit. In 1849 Stanton purchased a lot, containing nine acres, having on it a dwelling-house and other improvements, for which he was to pay $1,000 cash, and $4,000 in four equal annual installments, for which he gave his notes. Of the $1,000 cash, he borrowed of his wife $500 belonging to her separate estate. In December, 1850, a store, storehouse and lot were offered for sale for $7,000, which Stanton desired to purchase as a place of business, but was unable to do so and complete the contract for his house and lot. He thereupon proposed to his wife and her trustee to assume the contract for the house and lot, and to exonerate him therefrom, so that he could purchase the store and lot, which proposition was accepted by them. Thereupon Mrs. Stanton refunded to her husband the $500 paid by him on the purchase money, and, as the notes for the purchase money became due, they were taken up by Mrs. Stanton with funds out of her separate property. From the date of this arrangement the house and lot were considered, treated and agreed to be the property of Mrs. Stanton, and therefrom, the property was subject to and was actually managed and controlled by her. In 1854, Stanton purchased in his own name five acres adjoining the nine acres mentioned, taking title as before, to himself, for which he gave his note of $1,000, payable in one year. This contract he at the time turned over to Mrs. Stanton, who paid and took up the note at its maturity, with the agreement as in regard to the nine acres, that the property was to be hers. These two parcels of land, united, were known as "the Elms," and constituted the property mentioned in complainant's bill of complaint.

Expensive repairs upon, and additions to, this property were made by Mrs. Stanton, out of her separate fund, to the amount of ten or fifteen thousand dollars, all under her dictation, as upon her individual property.

In fact, from the arrangement in December, 1850, the property was in all respects under her management, as her own—so considered, and practically treated in the family.

In January, 1862, Stanton and Stockman gave their note, with Mrs. Winston as surety, to Ralph Butterfield, the complainant, for $5,000, to renew the note of Stanton and Stockman for money previously loaned to them, payable in January, 1863.

In July, 1865, Stanton conveyed the property mentioned to Mrs. Winston, for the use of his wife.

In October, 1866, Butterfield recovered judgment against Stanton and Mrs. Winston, upon the note alluded to, for the sum of $8,012 50.

In 1867, execution upon this judgment was returned *nulla bona.*

The conveyance upon the marriage settlement in 1843, by Stanton, to Mrs. Winston, as trustee, for the use of his wife, was duly recorded, as were all the deeds referred to.

The averments and denials in the bill and answer, are full and ample. The bill alleges the conveyance from Stanton to his wife's use, in 1865, to be fraudulent and void, and that he "gave credit to the said Stanton in consequence of the possession of said lot and its improvements, and other property." The prayer of the bill is, that this property be subjected to the payment of the judgment of the complainant.

The defendants, in their several answers, deny all fraud, and are minute and explicit in their statements, which are fully sustained by the evidence, showing valuable consideration and undoubted good faith in all the transactions of the parties.

Butterfield and Stanton were examined in open court, and their testimony is as follows:

Butterfield stated: "I am complainant in this cause. I know 'the Elms' property. David Stanton was in possession and owned the Elms. I never saw David Stanton in possession of the property. I knew that he was living there.

I lent the money to Stanton and Stockman. The note sued on was a renewal of the original, taking Mrs. Winston as security. I never heard of any one except David Stanton having any interest in the property until I was about to bring suit on the note. I satisfied myself that Stanton had property before I loaned the money. I had investigated Stanton's affairs to ascertain if he had the ability to pay. I examined the records of the probate clerk's office. I learned from them that he owned the Elms and the store at the corner of Main and Pearl streets, Natchez. The fact of Stanton's possession of the Elms had an influence on me in lending the money. Stanton and Stockman applied to me through S. D. Stockman for money. I think I should not have lent the money if I had not thought they were possessed of property. I supposed the house was solvent. I would not lend only to men who owned real estate. I was in the habit of lending money. I delayed a few days before I lent the money. The delay was to make the investigation of Stanton and Stockman's standing. I knew nothing of the homestead exemption. I don't think I found any real estate in the name of Stockman. I gave credit because the firm was in good credit and one or the other owned real estate."

On cross-examination he stated: "The original contract was made with Stockman. I don't recollect that Stanton was present when the original contract was made. Nothing was said about the possession of the property when the loan was made. When examining the records I merely saw the deed to Stanton. If I had not found the deed to the Elms, I think I should not have loaned the money; can't say positively, however. I found Stanton and Stockman's credit, as merchants in Natchez, good at the time I lent the money. I suppose the property on Main street was worth as much as the money loaned. I did not ask a lien on the Elms as security on the renewal of the note. Neither Stanton nor Stockman proposed to pledge the Elms to me. I don't think Stanton ever said that the Elms would be liable for his debts. At the time of the renewal of the note I learned that Stanton

did not own a plantation on the other side of the river. The plantation belonged to Mrs. Ann W. Winston and the wife of David Stanton. They gave me Mrs. Winston as additional security. She had property, and I considered her solvent. I don't remember finding any property in the name of Stockman; my attention was directed to Stanton as the money partner of the firm."

David Stanton, being sworn and examined, stated : "I am defendant in this cause. The contract was made for the firm by Mr. Stockman. I had no negotiations with Dr. Butterfield at the time. The subject of the possession of the Elms was not mentioned to me at the time. I did not attempt to get credit from any one because of my possession or ownership of the Elms. If the Elms property had been mentioned at the time the loan was made, I would have said that no lien could be had on the "Elms" property, I never proposed to mortgage the Elms for any debt of my own, or of Stanton and Stockman. Their credit was very good in 1859. The value of the store in 1859 was $12,000 or $14,000 previous to improvements. The improvements were additions to the house; after improvements, the house was worth $20,000. I owned the store in my own name, and as my own property. The property was burned during the war. My insolvency was in consequence of the war."

On cross-examination the witness said : "At the time of the loan, Stanton and Stockman owed other borrowed money. Don't know how much capital was borrowed. Don't know how much the cash capital was at the time of the loan of Butterfield. I paid the taxes on the Elms. It was assessed in my name. I never told Dr. Butterfield that the Elms did not belong to me. So far as the public knew, there was no difference in my acts before or after I agreed to let Mrs. Stanton have the property (Elms). There was nothing to give the public to understand that there was any question as to the ownership of the Elms—the records showing that the title was in me. Never thought the question of the title of importance, and never made it a subject of discussion. My

wife made such improvements as she chose, and I settled the
bills myself without explanation. All drafts were signed,
A. W. Winston, by David Stanton, to pay all the bills."

Excepting the exhibits, no other evidence was given on
the part of the complainant than his own testimony. Depo-
sitions of several members' of the family of Stanton were
read, and the account and merchant's books of Mrs. Winston
were examined on the hearing, emphatically vindicating the
good faith of defendants.

The court below, on the final hearing, answers, exhibits,
and testimony, dismissed the complaint, or bill. From this
decree, the case comes to this court. The complainant rests
his cause here upon the construction which may be given, in
view of facts, to art. 24, p. 335, Revised Code, the counsel
expressly exonerating the defendants from the charge of
fraud in fact. So much of this article as is applicable is as
follows:

"And if the husband shall purchase property in his own
name, with the money of his wife, he shall hold the same
only as trustee for her use, but such trust shall be void as
against creditors of the husband, who contracted or gave
credit, in consequence of the possession of such property."

The essential elements of this provision of the Code, are:

1st. The husband must "purchase the property in his own
name," as did defendant Stanton in the case at bar.

2d. With "the money of his wife." The "husband" in
in this case did not purchase the property involved, "with
the money of his wife."

3d. The creditor must have contracted or have given credit
in "consequence" of the possession of the property sought
to be charged. The complainant states that Stanton was in
possession of and owned this property; that he never heard
of any one except Stanton having an interest in the property,
and that he examined the records and found that Stanton
owned "the Elms" and store lot; but he does not testify
that he gave the credit "in consequence" of the possession
by Stanton of this property. His further testimony on

this point is this: "I satisfied myself that Stanton had property before I loaned the money. * * * * * I had investigated Stanton's affairs to ascertain if he had the ability to pay. * * * * * The fact of Stanton's possession of the Elms had an influence on me in lending the money. * * * * * I think I should not have lent the money if I had not thought they were possessed of property. * * * I supposed the house was solvent. . I would not lend only to men who owned real estate. * * * * I delayed a few days before lending the money, in order to make an investigation of the standing of Stanton and Stockman." The result of such investigation, and the basis of the credit, the complainant thus sums up in his testimony, positively negativing the theory on which he invokes the aid of the court: "I gave credit because the firm was in good credit, and one or the other owned real estate."

On cross-examination he said: "If I had not found the deed to the Elms, I think I should not have loaned the money; can't say positively, however. I found that and Stanton Stockman's credit, as merchants in Natchez, was good at the time I lent the money. At the renewal of the note I learned that Stanton did not own a plantation on the other side of the river. They gave me Mrs. Winston as additional security. She had property and I considered her solvent."

So far from proving that he gave credit to Stanton in consequence of the possession of this property, this hypothesis is emphatically contradicted. The substance of his testimony, and his whole case, is contained in the statement: "I gave credit because the firm was in good credit, and one or the other owned real estate."

But as though this were not conclusive, the complainant, upon the maturity of the original note for the money loaned, was disappointed to learn that Stanton was not the owner of a plantation "over the river," on which he had evidently relied in giving the first credit, when, instead of demanding payment, or specific security upon property, he renewed the

note, accepting as surety, Mrs. Winston, of whose responsibility he testifies: "She had property, and I considered her solvent." With the temptation of a large judgment to be secured, and in view of the fearful losses of the war, we believe the complainant to have testified impartially. Unless we disbelieve him and hold' him perjured we are unable to find that he gave credit "in consequence" of the possession by Stanton of this particular property.

It may be observed of this statute:

1. That it is exceptional and almost penal, as to the wife, in declaring a trust to her use void, in the contingency stated, whereas, the rule as to others is, that where a resulting trust is raised, as between the *cestuy que trust* and creditors of the trustee, the trust, if free from fraud in the beneficiary, will be upheld, this trust being good without registry against all creditors. Kelly v. Mills, 41 Miss., 267. This statute ought therefore to be strictly construed.

2. Though the statute declares the trust void as to a class of creditors, it creates no lien on the property. There is on this property no lien in fact, nor by implication, nor by express statute. Article 24 only declares the trust void in the cases stated. It creates no lien. In other words, the trust created in article 24 is made void as to a class of creditors, and as to these, the property thus subjected to their debts is bound only as other property, there being no lien until one is obtained by judgment, mortgage, or otherwise. There is none *per se.*

3. The trust provided for in this statute is available to the wife except as to those creditors giving credit on account of this particular property. To benefit creditors the contract of credit ought, therefore, to be based upon it, and it ought, in some way, to be defined or distinguished by the parties at the time of the credit. It should be definitely made to appear that the possession of the particular property was the occasion of the credit. To say that a creditor may lock the motive of the credit as a secret in his own breast, to be profoundly retained until an emergency arises when he can de-

velop a specific claim to particular property, after years of secrecy, seems to be inadmissible. The property, therefore, at the time of the contract, should be made the basis between the parties, of the credit, so as to distinguish it from the claim of ordinary creditors.

4. To obtain the benefit of this statute, parties must bring themselves clearly and fully within its terms, as it can apply only to the cases specifically described therein, and affirmatively brought within its provisions. The courts cannot extend it to cases not distinctly embracing all its material features, nor can they presume a case which the party fails to prove. We are of the opinion, therefore, that the case at bar is not within the article of the Code, because, 1. The husband did not purchase this property with the money of his wife; therefore, 2. The trust was not created, as a matter of fact; 3. The credit was not given "in consequence" of the possession of this particular property, and 4. Generally, the case, in no material aspect, conforms to article 24.

But if not within article 24, may not article 23 apply to and govern the case?

Counsel for appellant expressly waives fraud in fact, and makes no reference to this article, resting his case wholly upon article 24.

The article itself applies to conveyances from the husband to the wife, whereas, in the case at bar, the conveyance is to a third person.

But the whole object and purport of article 23 is to secure to married women, as their own separate property, all such property or rights of whatever name or kind which shall accrue to them by will, descent, distribution, deed of conveyance, recovery, or otherwise, and such property shall not be subject to, or taken in satisfaction of, the debts of the husband, nor shall such property, or any part thereof, be sold, conveyed, mortgaged, transferred, or in any manner encumbered by the husband, unless the wife shall join in the conveyance, etc., with the proviso, that "any deed from the husband to the wife for her use, shall be void as against

his creditors, who were such at the time of executing the deed," etc. It will be seen, that the entire purpose and scope of this article is to secure to the wife all such property as shall accrue to her by will, descent, distribution, and deed of conveyance, etc., or otherwise, except that a conveyance to her from the husband shall be void as to creditors. It is evident that the conveyance mentioned in this statute has reference to the conveyance of property of the husband to the wife without consideration, and in fraud of the rights of his creditors.

In the case at bar, the wife had inherited a large property from her deceased father, which article (23) is expressly designed and undertakes to protect, and secure to her as her separate estate. By a marriage settlement duly executed and recorded in 1843, when free from debt, Stanton had conveyed to the trustee of his wife her separate estate, thus inherited, and by that conveyance he was bound to secure to her the avails of her inheritance. He thereby detracted nothing from his own means.

The property in controversy was paid for by the trustee out of the separate property of the wife, secured to her as stated. Not a dollar had been contributed to its purchase or improvement by the husband.

The conveyance of 1865, transferred only the property thus paid for by the wife, out of her separate estate. Not one cent of the means or property of the husband was included in that transfer. It was not, therefore, 1. A conveyance from the husband to the wife, but to a third person; and 2. It was not a deed of gift of property of the husband, or a voluntary conveyance, but the *bona fide* reimbursement to the wife of the proceeds of her own separate estate, which article 23 declares shall be inviolable, and shall not be subject to, or taken in satisfaction of the debts of, the husband.

We are conducted to the conclusion that this case is not within either the letter or spirit of article 23, and such we understand to be the doctrine of the authorities.

A conveyance by the husband to the wife, and post-nuptial

contracts between them, were at common law void, because they are held in law to be one person, but in equity they were always upheld, even though voluntary, as against the husband and his representatives, if but a fair and reasonable provision for the wife; and if made on valuable consideration, good against creditors.    Ratcliffe v. Dougherty, 24 Miss., 181, and cases following that; 26 Miss., 66; 28 ib., 717. The case of Ratcliffe v. Dougherty, was under the act of 1839, which qualified the wife's power to acquire property by the proviso, that "the same does not come from her husband after coverture."    Hutch. Code, 497, § 1.    It was held in that case that the act did not change the rule in equity, and left the subject as it stood before, or, in the language of the court, "the evident intention of the legislature, by the act of 1839, was to affect no change whatever in the law relative to gifts, etc., from the husband to the wife, but to leave the rights of the wife in relation thereto subject to the provisions of the law as they existed anterior to its passage," etc. In Warren v. Brown, 25 Miss., the case of Ratcliffe v. Dougherty is explained and confirmed, and both these cases are cited, approved and enlarged upon in Wells v. Treadwell, 28 Miss., 717.

Wiley v. May, 36 Miss., 516, is a still more emphatically expressed case, wherein it was held, that even when the conveyance is directly to the wife, the act of 1839 would only affect voluntary conveyances, and the court say, "The doctrine is well settled that such settlements, when made in good faith, and for valuable consideration, are good against creditors and purchasers."

The act of 1839 was entitled, "An act for the protection and preservation of the rights of married women," and in Ratcliffe v. Dougherty, it was held to be "evidently an enabling statute."    By that act "any married woman" might "become seised or possessed of any property, real or personal, by direct bequest, demise, gift, purchase," etc., "provided the same does not come from her husband after coverture."

The act of 1857 is similar, and for a like purpose, but with the proviso, "that any deed from the husband to the wife, for her use, shall be void as against his creditors, who were such at the time of executing the deed."

Evidently this exception in the code of 1857, as to creditors, has reference to gifts, or voluntary conveyances, and not to conveyances for a valuable consideration, and in good faith. It cannot be supposed that the code, which more emphatically secures to the wife her separate estate than the law of 1839, and which declares that it shall not be subject to, nor liable to be taken in satisfaction of, the debts of the husband, any more than the law of 1839, intended to impair, or change the rights of married women, or meant to put her in a worse position as to her rights as a creditor, or claimant, than anybody else, or that the right of creditors to attack conveyances as fraudulent, or voluntary, was designed to be enlarged, as against a married woman. It was never questioned that a conveyance to a trustee, for the use of the wife, took the case from the operation of the common law, nor is it less well understood that it had the same effect as to the law of 1839, for the reason that the disability to convey did not exist between the husband and a third party. Hence, we conclude, that the proviso, in article 23, p. 336, Revised Code, has reference to voluntary conveyances, directly from the husband to the wife.

But the counsel waive fraud in fact, and rely upon article 24. We have already stated our opinion that this case is not embraced in article 24, and the written waiver of counsel, even if our reasoning is incorrect, effectually disposes of article 23, as far as the case is concerned.

In bestowing enlarged and important rights upon married women, the code simply intended to save the rights of creditors, lest these laws should be construed into a sanction of voluntary conveyances by the husband to the wife, as against them. In the language of the court, in Baygents v. Beard, et al., 41 Miss., the code saved the rights of creditors "as in all other cases," or in other words, that to creditors should

be preserved the right to attack these conveyances as fraud-
ulent, or voluntary. Such is the law as to all voluntary con-
veyances. Revised Code, 359, art. 2. In its progressive
legislation for the benefit and protection of the rights of
married women, the code also simply intends to save the
rights of creditors as well, so that, in removing the disabili-
ties of the common law, it leaves conveyances, if fraudulent,
or voluntary, subject to the assailment of creditors. The
code designed to make the conveyance to the wife valid,
though trustees be interposed, but also intended to save
to creditors their right to show it to be voluntary or fraudu-
lent. Conveyances to a trustee were good at law and in
equity, if made in good faith, and for valuable consideration,
but if not *bona fide*, and for value, creditors might assail
them. So as to conveyances from the husband to the wife,
" as in all other cases."

This disposes of article 23, and leaves the case to be tested
by the general principles of law and equity applicable to
this class of cases.

The facts are few and simple. The property was paid for
by the trustee, out of the estate of the wife, and the convey-
ance was from the husband to the trustee, to reimburse. The
consideration is ample, and the *bona fides* above suspicion.
In fact, the evidence of the *bona fides* of these defendants,
and the valuable considerations of their transactions, render
this case almost exceptional in these respects, in judicial
experience.

Upon this state of facts, is the deed from Stanton to the
trustee of his wife, valid against his creditors? It requires
no reasoning to prove that Mrs. Stanton has, at least, equal
equities with the complainant. She, in good faith, took up
her husband's notes for the purchase money of the property,
to which she believed she had, or would have, title. She had,
in confidence, expended large sums in improvements. Those
notes, at least, were a subsisting claim against her husband,
and she was his creditor to the amount of those notes and
interest. The complainant was a money lender, and advanced

his money as a business enterprise, upon what he believed to be a safe adventure, well knowing, however, by experience, the uncertainties of life and of financial operations, while Mrs. Stanton, a wife, a mother, and a woman unused to the risks and chances of business, and excluded from active participation in such transactions, confiding in the arrangement by which she became, as she supposed, the owner of the Elms, expended fifteen to twenty thousand dollars in paying for and improving the property.

That the husband and wife may have direct dealings with each other, is now so well settled as to preclude question. It is no less firmly established that the wife may become the creditor of the husband. Cord; Simmons v. Thomas, 43 Miss., 31. So, a deed from the husband to the wife, under the law prior to that of 1857, is valid as between the parties, and good as to strangers, if resting upon a valuable consideration and honest motive. 28 Miss., 717; 24, ib., 181; 25, ib., 160; ib., 66. The tendency of the modern decisions in this, as well as in the courts of most of the other states, has been to leave the questions of fraud open to investigation, to be determined by. all the facts which tend to show the actual intention with which the conveyance was executed." Cord, 29, § 63.

It is said that " courts of equity " will " examine " every " transaction between husband and wife with an anxious watchfulness and caution." Satisfied upon the questions of consideration and intent, the rights of married women are looked upon with favor. In Simmons v. Thomas, 43 Miss., 31, the court say: " In late years there has been a great enlargement of the property rights and interests of married women in this and many other states. The scope of the legislation has been to secure to her the *corpus* of the property which she brought into the marriage, or subsequently acquired, and also, to give to her the income and revenues of her separate estate free from the rights of use, or disposition on the part of the husband."

That Stanton could have discharged a *bona fide* debt, doing

so in good faith, to a person other than his wife, by the conveyance of real estate equivalent in value to the indebtedness, we suppose unquestionable. Story's Eq. Jur., § 1264. So, holding real estate in trust for another person than his wife, that the conveyance thereof to the *cestuy que trust* would extinguish the trust, we apprehend, to be equally clear, if, forgetting for a moment the relation between Mr. and Mrs. Stanton, the claims of Mrs. Stanton, as a creditor of Mr. Stanton will be apparent. Plat Stanton was, in conscience and honor, bound to convey this property to the trustee of Mrs. Stanton, in compliance with his agreement to do so, the facts admit of no question. If, to a bill for specific performance, the statute of frauds could have been successfully interposed, yet, the conveyance having been made, and being for a valuable consideration, and from honest motives, it ought to be sustained. If a wife charge her estate with the payment of her husband's debts, or apply her separate estate to such purpose, and it does not appear to have been intended by her as a gift to her husband, equity will decree the husband's assets to be applied in exoneration of her estate, or in repayment of the money advanced. Cord, 525, § 980.

This doctrine pervades all the text writers on this subject. *Vide* Story's Eq. Jur.

In Wiley v. Gray, 36 Miss., 510, this doctrine is very emphatically declared, and the court say : " It was not material whether Mrs. Gray's funds and property were appropriated by Gray, with or without her consent, as, in either event, she was, in an equitable point of view, a creditor of Gray to the amount of the value of the property which he had converted to his own use. * * * * * * The fact admitted in the answer, that Gray was then indebted to the appellants, is not of itself sufficient grounds for questioning the *bona fides* of the settlement, which, as we have seen, was made upon a valuable consideration."

The post-nuptial settlement of 1843, as it withdrew nothing from the estate of Stanton, was not only proper and legal, but commendable. Story's Eq. Jur. That settlement bound

the husband to refund whatever sum he might divert from her separate estate, and equity would have enforced its reimbursement. Story's Eq. Jur. As a " settlement," the conveyance of 1865, being for a valuable consideration, and from pure motives, is abundantly sustained by authority.

In Wiley v. Gray, the court say : " The capacity of a husband and wife, after marriage, to contract, for a *bona fide* and valuable consideration, for a transfer of property from the husband to a trustee, for the benefit of the wife, or to her directly, is not now a subject open for discussion." 36 Miss., 510, and cases. " Such settlements, when made *bona fide*, and upon a valuable and adequate consideration, are good against creditors and purchasers." 25 Law Lib., 81 ; Atherly on Mar. Set., 156–162, and cases. " The true point of inquiry," say the court, in Wiley v. Gray, " is whether the conveyance was made upon a valuable and fair consideration, so as to repel the presumption of fraud." The same sentiment is expressed by Cord. See, also, Simmons v. Thomas, 43 Miss., 31, and Story's Eq. Jur.

" Agreements between husband and wife, during coverture, for the transfer of property from the former, directly to the latter, are undoubtedly void at law; and equity examines, with great caution, before it will confirm them. But equity does sustain them upon a clear and satisfactory case made out that the property is to be applied to the separate use of the wife, where the consideration of the transfer is a separate interest of the wife, yielded up by her for the husband's benefit, or that of their family, or which has been appropriated by him to these uses ; or where the husband is in a situation to make a gift of property to the wife, and distinctly separates it from the mass of his property, for her use. Such transfer will be sustained in equity, although no trustee is interposed to hold for the wife's use. Wallingsford v. Allen, 10 Pet., 583.

" The cases in which grants from the husband to the wife have been set aside, are where there was some unfairness in the intention, or uncertainty in the declaration of it." Ib.

"Among creditors equally meritorious, a debtor may conscientiously prefer one to another, and it makes no difference that the preferred creditor is his own wife." Maginac v. Thompson, 7 Pet., 348, affirming Bald., 344.

This case does not arise by implication of law, but grows out of an express contract between the husband and the trustee of his wife. We have seen that the wife not only performed the stipulations of this contract on her part, but expended twice or three times as much in improvements, in the faith of her title. Though long delayed, the husband, also, complied on his part, by conveying the property prior to any actual incumbrance.

It is a general rule, that what a party may be compelled to do by suit, he may voluntarily do without a suit. Wiley v. Gray, 36 Miss.; 510; Story's Eq. Jur., § 1267, and cases.

As a creditor of her husband, and her right to satisfaction or reimbursement, the authorities are uniform. A learned and favorite author says : " The wife may become a creditor of the husband, by acts and contracts, during coverture, and her rights as such, will be enforced against him and his representatives. Thus, for example, if a wife should unite with her husband to pledge her estate, or otherwise to raise a sum of money out of it, to pay his debts, or to answer his necessities, whatever might be the mode adopted to carry that purpose into effect, the transaction would, in equity, be treated according to the true interest of the parties. She would be deemed a creditor or surety for him (if so originally understood between them), for the sum so paid, and she would be entitled to reimbursement out of his estate, and to the like privileges as belong to other creditors. 1 P. Williams, 264; 3 Paige, 614; 2 Ves., 663; 16 Ves., 356; Story's Eq. Jur., § 1373, and cases cited in the note. " It is a settled doctrine in England and this country, that the devotion of her own property, by a wife to the use of her husband, or the making a charge upon it for his benefit, will support a settlement by the husband in favor of his wife. Lady Arundel v. Phipps, 10 Ves., 130 ; Chapman v. Emory, 1 Cowp., 280 ; Atherly on

Mar. Set., 163; 25 Law Lib., 85; Taylor v. Heriot, 4 Desaus., 227; 1 Johns. Chan. Rep., 261; Bullard v. Briggs, 7 Pick., 538; Wiley v. Gray, 36 Miss., 510.

Even were title still in the husband, upon the facts in this case, the courts would protect the rights of the wife. Courts of equity " have adopted principles exceedingly broad and comprehensive in the application of their remedial justice ;" and they will sometimes " administer even a stern justice in favor of innocent persons, who are sufferers " and " without any fault on their side." This is often done by converting the offending party into a trustee; and by " making the property itself, subservient to the proper purposes of recompense, by way of equitable trust or lien." Story's Eq. Jur., § 1265; 30 Miss., 161; 39 ib., 462. So, courts of equity have extended the doctrine of compensation, or lien for repairs and improvements to cases where the party has acted *bona fide* and innocently, and there has been a substantial benefit conferred on the owner, so that in justice and equity, *equo et bono*, he ought to pay for such benefit. Story's Eq. Jur., § 1237.

The height of natural justice is, when no man becomes rich, or is benefitted by another's loss or injury, or, as in the text, *pure naturæ est, neminem curia alterius detrimentus et injuria fieri locupletiorem.*

As to the marriage settlement of 1843, we observe :

1st. A settlement being out of the estate of the husband, the rule is, " where there is no ground to suspect fraud, that it amounts only to a reasonable provision for the wife; it will, even though after coverture, be sustained in equity." Story's Eq. Jur., § 1375.

2d. Where the property is inherited by the wife, or conveyed to her by a third person, and not by the husband out of his own property, the rule is this : " It has, for more than a century, been established in courts of equity that the intervention of trustees is not indispensable, and whatever real or personal property is given or devised, or settled upon a married woman, either before or after marriage, for her sepa-

rate and exclusive use, without the intervention of trustees, the intention of the parties shall be effectual in equity, and the wife's interest protected against the marital rights and claims of her husband, and of his creditors also." Story's Eq. Jur., § 1318.

A voluntary settlement made by a husband, not indebted at the time, is good against subsequent creditors. 8 Wheat., 229. In cases of this character, the real point of inquiry is the consideration and intent. The consideration being valuable, and the transaction *bona fide*, the text writers and the adjudicators recognize the validity of conveyances from a husband to the wife, or her trustee, for her use, against all creditors.

Recognizing the conveyance sought to be vacated, as pure and untainted with fraud, the case is one in which " the rights and interests of the wife will be assiduously protected in equity." 3 Atk., 399; 10 Sim., 377; Story's Eq. Jur., § 1381, and cases cited in note. As, in Simmons v. Thomas, " the summary of the argument is, the estate, both in crops and income, is preserved to the wife." Or, as in 47 Penn., 308, " the law protects the estate, and equity sustains the instrument which represents it." *Vide*, also, Pennington v. Acker, 30 Miss., 161; Burks v. Loggins, 39 Miss., 462.

Our conclusion is, that the conveyance from Stanton to Mrs. Winston, for the use of his wife, in 1865, ought to be sustained upon the highest and purest principles of justice and equity.

The decree of the court below is affirmed.

SIMRALL, J., takes no part in the decision of this case.